IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE CINCINNATI INSURANCE COMPANY, )
                                  )
              Plaintiff,          )   CIVIL ACTION
                                  )
v.                                )   No. 12-4093-KHV
                                  )
KDL, INC.,                        )
                                  )
              Defendant.          )
_____)

## MEMORANDUM AND ORDER

The Cincinnati Insurance Company ("Cincinnati Insurance") filed suit against KDL, Inc. seeking declaratory relief on a contract for property insurance. This matter comes before the Court on Plaintiff's Motion For Summary Judgment (Doc. #36) filed October 30, 2015. For reasons stated below, the Court overrules plaintiff's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings and materials in the record show no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Applied Genetics Int'l, Inc. v. First Affiliated

Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court views the record in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 380 (2007). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

**Factual Background**

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to KDL, the non-movant.

Cincinnati Insurance insured KDL under a Commercial Policy of Insurance, effective June 1, 2009 to June 1, 2010.[1] KDL is a property holdings company. KDL has shared ownership structures with Lindemuth, Inc., Lindy's Inc., K Douglas, Inc. and Bellairre Shopping Center, Inc. (the "Lindemuth Entities"). Collectively, KDL, the Lindemuth Entities and Kent and Vikki Lindemuth own and manage some 120 commercial, industrial and residential properties, most of which are located in Topeka, Kansas. KDL has no outside or independent property manager. KDL, the

---

[1] Cincinnati Insurance is an Ohio corporation, with its principal place of business in Ohio. KDL is a Kansas corporation with its principal place of business in Kansas.

Lindemuth Entities and Kent and Vikki Lindemuth are "Named Insureds" under the Policy.

As part of KDL's property management functions, it owns, maintains and stores machinery and equipment. KDL commonly uses unoccupied spaces for storage of its equipment and machinery, especially in spaces such as strip centers or malls where several tenants are housed in one building structure or within close proximity to other properties which KDL owns and manages. KDL also routinely uses its open space to store the personal property of Lindemuth Entities.

KDL owns and operates a commercial shopping center known as Deer Creek Shopping Center in Topeka, Kansas. Deer Creek has about 63,397 square feet of commercial lease space. In June of 2009, Falley's Market, a grocery store which occupied about 41,687 square feet of retail space at Deer Creek, closed.[2] After the grocery store closed, KDL maintained electricity service but discontinued gas and water service in the grocery store space. KDL also used the space to store equipment and supplies, including materials for construction repair, painting and remodeling. KDL used almost all of the Falley's space for storage. KDL routinely rotated equipment and machinery in the Falley's space and replaced it with other equipment and machinery.

Some time around March 27 to 30, 2010, an individual damaged the heating, ventilating and air conditioning units ("HVAC") on the roof of Deer Creek and stole copper pipes. Shortly thereafter, Topeka Police Department officers apprehended the individual.

The HVAC units and copper pipes are "covered property" under the Policy. Absent an exclusion, the damage and loss related to the HVAC units and copper piping is a covered loss under

---

[2] In March of 2007, a Dollar General store, which occupied approximately 8,500 square feet of retail space, closed. In August of 2009, a Tortilla Factory store, which occupied approximately 2,590 square feet of retail space, closed. Shortly after the tenants vacated the Tortilla Factory and Dollar General stores, KDL disconnected all utilities to the stores and did not use the space in those two units through 2010 or beyond.

-3-

the Policy. The Policy contains an exclusion for theft and vandalism as follows:

> (1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:
>
> > (a) When this Coverage Part is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.
> >
> > (b) When this Coverage Part is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:
> >
> > > 1) Rented to a lessee or sublessee and used by them to conduct their customary operations; or
> > >
> > > 2) Used by the building owner to conduct customary operations.
>
> (2) Buildings under construction or renovation are not considered vacant.

Policy, Building And Personal Property Coverage Form, § A.6.a, attached as Exhibit 3 to Plaintiff's Motion For Summary Judgment (Doc. #36). The Policy defines "operations" as follows:

> a.  Your business activities occurring at the "premises;" and
>
> b.  The tenantability of the "premises," if coverage for "Business Income" including "Rental Value" or "Rental Value" applies.

Id., § G.11.

KDL submitted a claim and proof of loss to Cincinnati Insurance seeking payment in excess of $250,000.00 for the damage related to the HVAC units and copper pipes. On August 8, 2012, plaintiff filed this declaratory judgment suit against KDL, alleging that it owed no coverage for the loss related to the HVAC units and copper pipes.[3]

---

[3] Plaintiff argues that the affidavit of Kent Lindemuth, which KDL submitted in response to its motion for summary judgment, is an attempt to create a sham fact issue. In particular,
(continued...)

-4-

**Analysis**

Cincinnati Insurance seeks summary judgment on the issue of coverage which involves interpretation of the Policy. In particular, the parties dispute the meaning of "customary operations." If KDL used the former grocery store space (which accounted for more than half of the total square footage at Deer Creek) for "customary operations" withing the meaning of the vacancy exclusion, Cincinnati Insurance agrees that the exclusion would not apply.

The interpretation of an insurance policy, like other contracts, is a question of law. See AMCO Ins. Co. v. Beck, 261 Kan. 266, 269, 929 P.2d 162, 165 (1996). Terms in an insurance policy are generally given their plain and ordinary meaning unless the parties have expressed a contrary intent. See Pink Cadillac Bar & Grill, Inc. v. U.S. Fid. & Guar. Co., 22 Kan. App.2d 944, 948, 925 P.2d 452, 456 (1996). The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would

---

[3](...continued)
Lindemuth stated that KDL "used the whole space . . . [t]o move[] different tools, machinery, equipment or inventory in and out of Falley's space." See Affidavit Of Kent Lindemuth ¶ 20, attached as Exhibit A to Defendant's Response To Plaintiff's Motion For Summary Judgment And Brief In Support Thereof (Doc. #38) filed November 20, 2015. Plaintiff claims that this statement contradicts his prior sworn statement.

The Court need not decide whether to accept Lindemuth's affidavit on this issue because his original testimony sufficiently supported the conclusion that KDL was using "almost all" of the grocery store space for storage operations. Examination Under Oath at 93 ("we had items sitting in the space, we used the entire space;" "almost all of it was used in a rotation"), attached as Exhibit 2 to Plaintiff's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #37); id. at 94 ("stuff coming and going;" "items there, insulation, different things all the time there"); id. at 95 (items not "packed in there like sardines, but there was a rotation"). The fact that Lindemuth could not quantify the precise square footage of the store that he was using at a particular moment is not dispositive. Under the exception to the vacancy exclusion in the Policy, KDL need not show that it was using every square foot of a store space; it only must show that the space was being used for "customary operations." Plaintiff has presented no evidence which contradicts Lindemuth's testimony that KDL used almost all of the Falley's store for storage purposes.

understand the language to mean. Farm Bureau Mut. Ins. Co. v. Winters, 248 Kan. 295, 300, 806 P.2d 993, 996 (1991). To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 248 Kan. 657, 659, 810 P.2d 283, 285 (1991). Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Id. If the policy is not ambiguous, the Court must enforce it according to its terms. See Am. Media, Inc. v. Home Indem. Co., 232 Kan. 737, 740, 658 P.2d 1015, 1019 (1983).

As the insured, KDL has the burden to prove coverage under the policy. See Shelter Mut. Ins. Co. v. Williams, 248 Kan. 17, 29-30, 804 P.2d 1374, 1383 (1991). Cincinnati Insurance bears the burden to show that the loss is excluded by a specific policy provision. See id. Policy exclusions generally require a "narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." Marquis v. State Farm Fire & Cas. Co., 265 Kan. 317, 327, 961 P.2d 1213, 1220-21 (1998).

The parties dispute (1) whether "customary operations" in the vacancy exclusion refers to customary operations of a retail store generally or KDL's specific operations at the premises and (2) what constitutes KDL's "customary operations" at the premises. Cincinnati Insurance argues that the Policy excluded the losses related to the HVAC units because KDL and its tenants were using less than 31 percent of Deer Creek for customary operations, i.e. retail sales of groceries, tortillas or other merchandise. KDL argues that it was using the former grocery store for its customary operations related to property management, i.e. storage and rotation of equipment and

supplies.

In relevant part, the Policy states that an area is considered vacant unless the "building owner" uses the space to conduct "customary operations."[4] Policy, Section D.6., Vacancy Provisions, at 63, attached as Exhibit 3 to Plaintiff's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #37). The Policy does not define "customary operations," but "customary" is ordinarily understood to mean "commonly practiced, used or observed." Saiz v. Charter Oak Fire Ins. Co., 299 F. App'x 836, 840 (10th Cir. 2008) (Colorado law) (citation omitted). The Policy defines "operations" as "[y]our business activities occurring at the 'premises.'"[5] Policy, Section G., Definitions, at 67, attached as Exhibit 3 to Plaintiff's Memorandum In Support Of Its

---

[4] The entire subsection reads as follows:

(b) When this Coverage Part is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

    1) Rented to a lessee or sublessee and used by them to conduct their customary operations; or

    2) Used by the building owner to conduct customary operations.

Policy, Building And Personal Property Coverage Form, § A.6.a, attached as Exhibit 3 to Plaintiff's Motion For Summary Judgment (Doc. #36).

[5] The complete definition of "operations" is as follows:

a.    Your business activities occurring at the "premises;" and
b.    The tenantability of the "premises," if coverage for "Business Income" including "Rental Value" or "Rental Value" applies.

Policy, Building And Personal Property Coverage Form, § G.11, attached as Exhibit 3 to Plaintiff's Motion For Summary Judgment (Doc. #36). Neither party has suggested that the "tenantability" of the premises is material in this case. In addition, because KDL did not seek coverage for business income or rental value, the Court does not consider the tenantability of the Falley's store at the time of the loss in March of 2010.

Motion For Summary Judgment (Doc. #37). When the vacancy exclusion language is combined with the definition of "operations," the second exception in the vacancy provision logically refers to the *building owner's* customary operations at the premises.[6] Therefore, in context, KDL's "customary operations" refers to its usual or commonly practiced business activities at the premises.

Plaintiff argues that in the context of this insurance policy, "customary operations" refers to the usual operations of a retail shopping center, i.e. the premises that it insured. Plaintiff The Cincinnati Insurance Company's Reply In Support Of Its Motion For Summary Judgment (Doc. #39) at 15. Under plaintiff's proposed interpretation, however, the second exception to the vacancy provision would be largely meaningless in the context of many retail strip malls. Property management companies and/or owners of multi-unit shopping centers do not necessarily use vacated

---

[6] Plaintiff has cited several cases which have addressed a similar or identical vacancy exclusion. See Saiz v. Charter Oak Fire Ins. Co., 299 F. App'x 836, 840 (10th Cir. 2008) (insured restaurant owner not conducting customary operations by using basement for office to conduct other business after restaurant closed); Keren Habinyon Hachudosh D'Rabeinu Yoel of Satmar BP v. Philadelphia Indem. Ins. Co., 462 F. App'x 70, 72-73 (2d Cir. 2012) (insured school not conducting customary operations by using property for storage of school supplies, furniture and computers following closure of school); Travelers Cas. Ins. Co. of Am. v. Wild Waters, LLC, No. 12-00481-CWD, 2013 WL 4710271, at *6 (D. Idaho Aug. 30, 2013) (insured water park not conducting customary operations because it did not open for two consecutive summers; mere incidental use as storage facility and performance of occasional maintenance not "customary operations" of water park); Sorema N. Am. Reinsurance Co. v. Johnson, 574 S.E.2d 377, 379 (Ga. Ct. App. 2002) (property owner who recently purchased building used as meat packing plant not conducting customary operations by storing meat packaging equipment); see also Oakdale Mall Assoc. v. Cincinnati Ins. Co., 702 F.3d 1119, 1124-25 (8th Cir. 2013) (mere advertising space for rent and seeking new tenant for space insufficient to show "customary operations" under vacancy provision); Bedford Internet Office Space, LLC v. Travelers Cas. Ins. Co., 41 F. Supp.3d 535, 547 (N.D. Tex. 2014) (leasing of insured buildings insufficient to show "customary operations;" lessee was merely "ramping up" to operate out of the property, property did not have electricity or water service and property owner's mere access and incidental storage of property did not constitute customary operations). The above cases do not compel judgment for plaintiff because the cases either (1) involved losses where the insured was a lessee, not the building owner, or (2) the building owner presented meager evidence that it was conducting customary operations at the premises separate from normal leasing activities such as preparing the building to be re-leased.

units to conduct the customary operations of the prior tenant or of a general retail store.  The second exception to the vacancy exclusion in the Policy contemplates that an insured property owner can avoid the exclusion if it is conducting customary business activities at the premises, without necessarily conducting the customary business activities of a typical tenant in that retail space.[7]

KDL has presented evidence that after Falley's grocery store closed, KDL used the space to store equipment and supplies related to its property management functions.  Cincinnati Insurance notes that KDL did not utilize the former grocery store, tortilla factory or retail store for the particular purposes of the prior tenants or for general retail sales.  As noted above, however, to satisfy the second exception to the vacancy exclusion, KDL must show only that it used the grocery store space for *its* customary business activities at the premises.  Viewing the evidence in a light most favorable to KDL, a reasonable fact finder could conclude that KDL's customary business activities at the premises included storage of its equipment and materials related to property management and that it used the grocery store space for that purpose within 60 days of the loss related to the HVAC units.  Accordingly, the Court overrules plaintiff's motion for summary judgment on this issue.

**IT IS THEREFORE ORDERED** that <u>Plaintiff's Motion For Summary Judgment</u> (Doc. #36) filed October 30, 2015 is **OVERRULED**.

**IT IS FURTHER ORDERED that a status conference is set for June 20, 2017 at 11:00 a.m. before the Honorable Gwynne E. Birzer, U.S. Magistrate Judge.**

---

[7] Plaintiff's interpretation is inconsistent with the structure of the vacancy exclusion. Because the first exception to the vacancy exclusion already addresses "customary operations" when the space is leased or subleased, the second exception to the vacancy exclusion logically refers to customary operations of some entity other than a tenant or subtenant.

**IT IS FURTHER ORDERED that a court trial is set for August 29, 2017 at 9:00 a.m.**

Dated this 13th day of June, 2017 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
